## KUYKENDALL v. UNION PAC. R. CO.

(Circuit Court of Appeals, Eighth Circuit. August 10, 1908.)

### No. 2,576.

EXECUTORS AND ADMINISTRATORS—SUIT TO REQUIRE ACCOUNTING—FAILURE OF PROOF.

A complainant in a suit in equity brought by him, as administrator, against a railroad company to obtain an accounting in respect to a large number of bonds alleged to have been the property of the decedent, *held* to have wholly failed to prove the alleged ownership of the bonds by the decedent at the time of his death, which fact was essential to entitle him to maintain the suit.

Appeal from the Circuit Court of the United States for the District of Utah.

D. W. Wood and David K. Watson, for appellant.

P. L. Williams (Maxwell Evarts, on the brief), for appellee.

Before VAN DEVANTER, Circuit Judge, and PHILIPS, District Judge.

PHILIPS, District Judge. This is an appeal from the decree of the Circuit Court dismissing the bill of complaint. The bill is a maze of verbiage. So confused and involved are the allegations and recitations, that it proved somewhat difficult to extract the actual substance. Briefly stated, the claim for relief is that of the original first mortgage bonds issued by the Union Pacific Railroad Company, under the organic act of Congress of July 2, 1864, there were $27,229,000, which became the property of one Charles Durkee, and were owned by him at the time of his death; which occurred in the state of Wisconsin in 1870. The complainant, John A. Kuykendall, was appointed administrator of his estate May 9, 1896, by the probate court of Salt Lake county, state of Utah, who instituted this suit, February 7, 1903, in the United States Circuit Court for the District of Utah, to have said bonds declared a first lien, under said mortgage, on the properties of the defendant, Union Pacific Railroad Company, a corporation of the state of Utah, the alleged successor of the original mortgagor company and the consolidated company, of the same name, which, it is asserted, succeeded to the rights and obligations of the original company.

The bill charges that Edwin D. Morgan and Oakes Ames were the original trustees named in said first mortgage to secure the payment of said bonds; that, they having died, F. Gordon Dexter and Oliver Ames were appointed as their successor trustees. It is then charged that a large number of persons, and some corporations, named as parties defendant, entered into a conspiracy to wrong and injure the estate, represented by said Kuykendall as administrator, by falsely

pretending that they were the owners of a large portion of the first mortgage bonds so issued by said original Union Pacific Railroad Company. To effectuate the conspiracy, and to exclude the said estate from participation in the fruits of the proceeding, the conspirators caused the said trustees to institute in the United States Circuit Court of Nebraska a suit to foreclose said mortgage, which resulted in a decree of foreclosure, under which the property of said railroad companies was sold, and bought in by the said defendant Company, corporation of the state of Utah, which was organized for such purpose, and a deed, in due form, was made and delivered to it therefor by the special master in chancery. The proceeds of the sale, not sufficient to satisfy the debts, were distributed pro rata among such of the bondholders as presented their bonds for such purpose. Before decree the complainant dismissed the bill as to all the defendants except the said Union Pacific Railroad Company of Utah.

The prayer of the bill is for an accounting to the complainant on account of said $27,229,000 bonds and interest, and for the enforcement of the mortgage lien for payment, etc.

As the ownership of the bonds in question by Durkee, at the time of his death, was put in issue by the answer, it was a primary issue of fact, lying at the threshold of the complainant's right to any relief. Unless he owned the bonds at the time of his death, and they passed by devolution of law to the complainant as administrator, the latter has no standing in court to assert any of the matters set forth in the bill. This was so self-asserting that at the opening of the argument by counsel for the complainant on this appeal we insisted that they point out to the court, in the record, the proof touching this foundational fact before they proceeded to the discussion of other matters in contestation. This was manifestly embarrassing to counsel. After some delay and search through the record, containing a mass of testimony on relevant and irrelevant matters, they referred the court for this essential proof to the deposition of one Leonard C. Blaisdell. He married a niece of said Charles Durkee. As there were left surviving no immediate heirs of Durkee, this niece, and, perhaps, others of like degree, would be the sole distributees of the large fortune in question.

The reading of this witness' testimony furnishes ample evidence that he is quite visionary and impractical, if not mentally unbalanced. His statements are incoherent, disjointed, and pointless. He refers to incidents occurring about 1882–83–84. It is, perhaps, inferable from his straggling statement that Durkee at some ungiven times was surety on the bond, or bonds, of some persons having contracts for the construction work on the Union Pacific Railroad. Inferentially, without direct assertion, the witness had a theory, but without proof to sustain the fact, that Durkee had put up with the Secretary of the Treasury of the United States some of said Union Pacific Railroad bonds as collateral security on said contracts. Being interested in the Durkee estate, the witness claimed to have had considerable correspondence with the Secretary of the Treasury, and perhaps the Comptroller of the Treasury, respecting this matter. But he neither made profert of any such letters, nor showed that they had been lost or destroyed, nor was any effort disclosed to ascertain by inquiry whether or not his

letter or letters were on file in the Treasury Department, where it is a well-known fact all such business correspondence is carefully preserved. He further testified that by special arrangement he visited Washington City, and in the office of the Comptroller of the Currency he met on this business Judge Folger, then Secretary of the Treasury, where were present every member of the President's Cabinet, save the Secretaries of the Army and the Navy. His version of what occurred, what was said, and what was the exact subject-matter of discussion is so vague and disjected as to mystify rather than enlighten. But the crux of it all is that Judge Folger then and there spread out on tables something over $64,000,000 of Union Pacific Railroad mortgage bonds, saying:

"I have here upon these tables the bonds of all these respective railroad companies duly executed as first mortgage bonds of a lien prior and paramount to that of the United States, and also a collection of bonds deposited by the companies with the Secretary of the Treasury of the United States, to secure interest upon the first mortgage bonds aforesaid."

After some colloquy with Attorney General Brewster, Judge Folger turned to the witness, and said:

"What do you want done with these bonds? And I answered: 'I want to have the protection of the bonds, interest bonds and principal, as provided by the acts of Congress.' He then proceeded to give me the instructions I asked for to proceed intelligently with himself in an adjustment of this particular obligation of said Pacific Railroad Companies."

The witness then digressed into something about Judge Folger asking his opinion about an act of Congress looking to refunding bonds, etc., quite as unintelligible and impertinent as most of his discursive statement. He did not read the bonds claimed to have been thus displayed over many tables, outside of the treasury vaults, in the office of the Comptroller; but stated that Judge Folger read them aloud, as payable on their face to Charles Durkee.

It must be conceded that this is mere hearsay testimony, no more competent in this action, to which Judge Folger is not a party, than would be a statement made by him in pais to some third party that he had seen in the vaults of the treasury Union Pacific bonds payable to Charles Durkee. The claim of this witness that Secretary Folger read the bonds, as made payable on their face to Charles Durkee, discredits his whole story. Such bonds were made payable to the holder or bearer so that they might perform the office of commercial negotiable paper passing by mere act of delivery. In addition, the exhibit filed with the bill of complaint, as expressing the recitation and form of the bonds claimed to have been owned by Durkee, shows that "the said company promises to pay unto the holder hereof at its office in the city of New York." Superadded to all this, the clerk of the United States Court for Nebraska, in obedience to the request of complainant's counsel, brought and presented, as a part of his deposition, specimens of the bonds left with him by the holders to receive their dividends under the foreclosure decree, which show that they were made payable "unto the holder hereof."

At the time of taking the depositions herein, and at the hearing of this suit, there was living and accessible a member of said cabinet who

Blaisdell testified was present at that remarkable meeting in the Comptroller's office when he claims the bonds were exhibited by Judge Folger, to wit, the Honorable Henry M. Teller, who was then Secretary of the Interior, and now United States Senator from the state of Colorado. While this appeal was on argument before us at the city of Denver, Colo., the sitting judges chanced to see Senator Teller on one of the streets of the city. We made inquiry from the bench of counsel for the complainant why no deposition of any one present at that alleged occurrence in the Comptroller's office was taken for a much needed confirmation. Receiving answer that it was understood that all of them were dead, we called attention to the fact that Senator Teller was then alive, present in the city, and suggested that, if counsel desired, the court, in the exercise of its equitable discretion in furtherance of justice, would indulge them to introduce Senator Teller and examine him, ore tenus, before us. This proffer was not accepted by counsel.

It is unbelievable, in view of the known exactness of the Treasury Department in bookkeeping, jacketing, and preserving every memorandum and paper appertaining to every transaction and matter connected with the department, that $27,229,000 of such bonds belonging to a third party could have been as late as 1882-83-84 in the custody of the Treasury Department of the United States without some record entry or memorandum showing how and on what account they came, for what purpose held, and what disposition was made of them. Furthermore, it is positively incredible that Mr. Durkee, who died testate in 1870, would make no mention in his will of the ownership of such a fabulous fortune. It is not difficult to discern the underlying purpose of taking out letters of administration on Durkee's estate, if he had any, in Utah, when his domicile at the time of his death was in the state of Wisconsin. Blaisdell testified that it was understood that this administrator was to be used in other litigation, but he was to have nothing to do with suits to recover on these bonds. The further evidence, however, develops what was the underlying scheme of this movement. A syndicate of "promoters" was formed. They devised the scheme of selling shares of stock in the chances of success in this suit. They even had agents, to be paid out of the funds thus collected, to exploit this stock. It was represented that, if the suit were won, the result would be over $200,000,000 in money for division among the shareholders. These agents accordingly disposed of some shares at the proportion of 50 for $1 in money; and, when the bait staled, they offered the still more alluring temptation of 100 shares for $1 in money; and the evidence shows that they succeeded in drawing from their dupes about $50,000. The evidence also showed that the administrator was party to and participated in the selling of said shares. What has become of this money is not shown. One of the witnesses for the complainant spoke of this scheme as a "Col. Sellers figures." One of the promoters the witness said:

"Looked like a broken down actor—same type as Col. Sellers—he said he was Col. Durkee's private secretary—wore a long black coat—all it lacked were the hoops to be a typical Col. Sellers—had whiskers on his pants," etc.

Such a combination does not commend itself to the favorable consideration of a court of equity.

As the complainant, when he closed the taking of testimony on his behalf, had failed to produce sufficient evidence of the ownership of the bonds declared on, the defendant was justified in declining to take countervailing testimony.

The decree of the Circuit Court is affirmed.